# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉.

## JOHNSTON v. MOORMAN.

### JANUARY 29th, 1885.

1. PRACTICE AT COMMON LAW—*Instructions.*—An instruction is not considered as abstract where the pleadings show that it might apply to the case. *Shelton* v. *Cocke,* 3 Munf. 191.

2. IDEM—*Torts—Evidence—Damages.*—In mitigation of damages, in an action for false imprisonment, it is allowable on cross-examination to prove that the plaintiff had boasted that he had gained a great reputation from his arrest and imprisonment.

3. JUDICIAL OFFICERS—*Liability.*—When acting within their jurisdiction, judicial officers are exempt in civil actions from liability for their official acts, although such acts are alleged to have been done maliciously and corruptly.

4. IDEM—*Idem—Jury.*—In civil actions against such officers, acting within their jurisdiction, it is not for the jury to decide upon the question of the reasonableness of the grounds of the arrest.

5. IDEM—*Idem—Case at bar.*—J., mayor of D., whilst acting in his judicial capacity, caused the arrest of M., who sued J. for damages for false imprisonment.

HELD :

J. was not liable to M. in damages for such arrest and imprisonment.

Error to judgment of hustings court of Danville, rendered 9th January, 1883, in an action of trespass on the case for false imprisonment, wherein W. A. Moorman was plaintiff and John H. Johnston was defendant. The defendant was mayor of Danville, and claimed to be acting in his judicial capacity when he caused the arrest and imprisonment of the plaintiff. At the trial the jury found a verdict for $2,000 damages in favor of the plaintiff, and the court entered judgment accordingly. To

this judgment Johnston obtained, from one of the judges of this court, a writ of error and *supersedeas*.

Opinion states the case.

*W. W. Gordon* and *Green & Miller*, for the plaintiff in error.

*Berkeley & Harrison*, for the defendant in error.

RICHARDSON, J., delivered the opinion of the court.

The main question for decision in this case is whether the mayor of a city or town acting within his jurisdiction and arresting offenders, actual or supposed, can in any case be held liable for damages, however erroneous his action, and though prompted by malicious or corrupt motives.

The facts as certified are these: On the night of August 11th, 1882, there was a public meeting in the town of Danville, which was addressed by John E. Massey, just before which one J. J. Wilkinson had an affray or row on the street with one A. J. Clark; that during the affray or row one J. G. Boney, a stranger in Danville, cried to Clark "hit him," which greatly incensed Wilkinson; that Moorman, the plaintiff below and defendant in error here, was not present or in any way concerned in that row. That the defendant in error introduced Mr. Massey to said meeting, remained upon the speakers' platform with him until the meeting adjourned, and then accompanied him to the hotel, and thence went to the billiard-room of C. T. Brown, just across Union street from the hotel, where he found S. P. Watkins, J. J. Verser, —— Anderson and J. G. Boney playing a game called pool, joined them and was introduced to Boney.

That the proprietor of the place then announced that he was going to close the bar-room, as he had been up late the night before, and was tired (it was then about 11:30 o'clock); whereupon the party all took a drink (the defendant in error testi-

fied that he took only one drink, and the witness, J. J. Verser, testified that Moorman, according to his recollection, took two drinks while at Brown's saloon). That the bar was then closed, and the party continued their game until it became the turn of J. J. Verser to treat, when (Brown's bar being closed) he invited the party to go to the Border House saloon of Nicholas & Hessberg, on Main street, and on the lower end of the same square, where the party arrived about 12:30 o'clock, and found the plaintiff in error, J. H. Johnston, the mayor of Danville, and one S. H. Yates, and all took a drink of beer together, at the invitation of Boney, after which they sang a song, in which Moorman and Johnston joined, and some of the party danced, and Johnston, the mayor and plaintiff in error here, "skipped round a little," but there was no disorderly conduct.

That shortly afterwards, while the party were quietly conversing and discussing politics, the barkeeper, M. J. Hessberg, hearing a noise in the front room of the bar, which was separated from the rear room, in which the parties were, by a partition and door of lattice work, went forward and found the said J. J. Wilkinson and one Wiley Brown; that Wilkinson looked through the door, and, pointing to Boney, asked who he was, and upon being told his name, immediately pushed the door open, rushed violently in, and in an angry voice cried out to Boney: "You are the God damned rascal who urged Clark to hit me," and immediately advanced on him, cursing him and menacing him. Boney retreated toward the rear end of the room, and Johnston, the mayor, duly elected, qualified and acting as such, immediately intercepted Wilkinson, took hold of, and commenced to push him toward a side door opening on Market street, out of which he finally pushed him into the street.

During this scuffle the barkeeper said: "Gentlemen, you must become quiet, or I will call a policeman;" to which Johnston replied: "I am the mayor, and I command the peace." The witness, S. H. Yates, assisted Johnston in ejecting Wilkin-

son, and then returned to where Boney was, Johnston remaining on the street with Wilkinson, who was very noisy, and continued to curse and threaten Boney—Johnston endeavoring to quiet him. The cursing and noise made by Wilkinson attracted the attention of two policemen, J. H. Cook and C. G. Freeman, who were some distance off, but immediately came up and.took a stand near the front door of the saloon, on Main street, Johnston and Wilkinson then being just across Market street at the corner of Main.

Immediately after the mayor had ejected Wilkinson, S. H. Yates took Boney and led him through a door into a passageway at the rear end of the bar-room; and Boney, as he was going out, called Moorman, the defendant in error, to him, saying he would rather have the advice of two than one, and that he wanted him and Yates to effect an honorable or peaceable settlement for him, to which Moorman replied that, as a friend to both parties, he would endeavor to effect a peaceable settlement. That Boney said he was unarmed, and wished to go to his home, and seemed afraid to go out on the street.

Moorman then went to where the mayor (Johnston) and Wilkinson were (Wilkinson then having become quiet), and, addressing Wilkinson, said: "Captain John, Boney is in the bar there, afraid to come out and go home; he says he wants you to let him come out and go home, that he is unarmed, and does not wish to be attacked unprepared." To which Wilkinson replied: "Tell him to come out and go home, that I am no damned assassin." And then Moorman said: "He says he will meet you to-morrow and settle the matter;" and Wilkinson replied: "I will meet him any time and any where;" to which Moorman replied: "You are both drunk to-night, and to-morrow there will be nothing of it; I don't know that he wants to fight you at all." And Wilkinson said: "I am not drunk; I have not taken a drink for five hours." Thereupon Mayor Johnston, addressing Moorman, said: "Go away from here; I am mayor, and I intend to settle this matter, and if you

don't go away I will send you to jail." To which Moorman replied: "Mayor Johnston, I recognize you as mayor, but I have done nothing for which to be sent away, and don't like to be sent away unless I have done something." The mayor then said to Policeman Cook: "Take that man to jail." Moorman then said: "Well, if you say so, I must submit," and started off with the policeman who, in pursuance of the mayor's order, had arrested him; but after proceeding a few steps asked to be allowed to return, which was permitted, and he then said, in a quiet and peaceable manner: "Mayor Johnston, I have done nothing, and demand a trial, or to be allowed to give bail." To which the mayor replied, angrily: "Damn it, take him to jail." The policeman then took him into that part of the jail building occupied as the jailer's room, and delivered him into the custody of the jailer, who took the keys, and was proceeding to carry him into the cells, when Moorman requested permission to write a letter to his employer; and while they were engaged in looking for pen and paper, a policeman came with an order for the release of Moorman.

After Moorman was released, he met with Wilkinson on the street, and they were together some time, talking on what had transpired, in a friendly manner. Moorman asked for and got Wilkinson's version of the affair, stating at the time that he intended to sue Johnston. In response to Wilkinson's version Moorman said: "If you stick to that I am all right, and will be willing to divide;" to which Wilkinson replied: "You cannot bribe me." In response Moorman immediately disclaimed any intention to offer a bribe, and said that he had used the expression merely to indicate that he was indifferent as to the money, but merely wished to vindicate his conduct, and set himself right in the community.

Shortly after Moorman was arrested and sent to prison the witness Verser came to Wilkinson, in the presence of Mayor Johnston, with a message from Boney, to the effect that he (Boney) was willing to meet Wilkinson the next day, and

fight him with pistols, bowie-knives, shot-guns, or any other weapons; and that Mayor Johnston did not cause or threaten to cause his arrest, and took no steps to arrest or cause the arrest of either Boney or Wilkinson.

In addition to the foregoing facts, the court below certifies that Moorman testified that he had felt deeply humiliated and mortified at the arrest, and had on that account been unable to sleep afterwards.

That the witness Hessberg testified that immediately after Wilkinson had been ejected from the saloon Moorman said, referring to Wilkinson: "That man ought to have a bullet through him;" that thereupon Hessberg said to Moorman: "You had better not have anything to do with this row or you will get into trouble;" to which Moorman replied: "I have not, and don't intend to;" but there was no evidence that these remarks were communicated to either Wilkinson or Johnston. On reëxamination Moorman denied using the language above, which called forth Hessberg's caution to him; but said that he did say something in an under-tone, the exact purport of which he did not recollect, but that he recollected Hessburg's caution and his reply as stated.

That Mayor Johnston testified that, as he was trying to put Wilkinson out of the saloon, Moorman caught hold of him, Johnston, and said: "When a man has been badly treated he ought to have some showing;" that he had thereupon slapped or shoved Moorman off from him and against the wall. That while he was out in the street, when Moorman came out to Wilkinson, he thought Moorman was bearing a challenge; and that he caused his arrest with a view to prevent a breach of the peace, and had no malice or ill-will against him, but acted only from a sense of duty. Moorman in his testimony denied that he took hold of either Johnston or Wilkinson, and stated that he did not bear any challenge between said parties, but was only acting as a peace-maker. That the witness Yates stated that he was the person whom Johnston shoved back. That the

witness Hessberg stated that during the scuffle between Wilkinson and Johnston and Yates, Moorman was standing about the middle of the bar and not taking any part. That the witness Verser stated that Moorman was at the lower end of the room, near him and Boney.

And the court further certifies that Johnston further stated that he did not hear Moorman offer bail and demand a trial; but the witness Wilkinson, who was near Johnston, the policeman Cook, who was with Moorman, and the policeman Freeman, who was a little distance off, all testified that they heard it, and Johnston's reply: "Damn it, take him to jail;" and that Moorman swore that he made the demand and received the reply. That the witnesses Yates, Wilkinson, Verser, Hessberg, Cook and Moorman all testified that Moorman during the whole time conducted himself in a quiet, orderly and peaceable manner, and did not participate in any disturbance or act in a riotous manner, though Johnston testified that he did.

And the court below further certifies that it was proved by both plaintiff and defendant that up to the occurrences of the night the relations between them had been kindly and friendly.

Such are the facts certified as material by the court below. It is obvious that many of them are not only immaterial and not properly facts proved, but matters about which the testimony is conflicting, as shown on the face of the certificate itself.

In August, 1882, W. A. Moorman instituted in the hustings court of Danville his action of trespass on the case for false imprisonment against J. H. Johnston. The declaration charges that on 11th of August, 1882, the defendant, without reasonable or probable cause, and to gratify personal and political spite and antagonism to the plaintiff, maliciously caused him to be arrested by policemen of said town and cast into prison. In his defence the defendant filed a plea of not guilty, and four special pleas to the effect that at the time of the alleged false imprisonment he was the duly elected and qualified mayor of

said town of Danville, and in virtue thereof a justice and con-
servator of the peace of the State of Virginia, in and for said
town, and that in the discharge of his duties as such official,
and in order to preserve and restore the peace and good order
of said town and State, and without any malice or ill-will what-
ever against the plaintiff, he caused the plaintiff to be arrested
whilst engaged in sundry violations of the laws, as particularly
designated in said pleas. Upon the issues joined on these pleas
a jury was impanelled, which returns a verdict of $2,000 for
the plaintiff, and judgment was rendered accordingly, to which
the defendant obtained, from one of the judges of this court, a
writ of error and *supersedeas*. During the trial four bills of ex-
ceptions were taken by the defendant to the rulings of the
court. The fourth bill of exception sets out the facts proved
substantially as stated above.

The plaintiff in error sets out in his petition several assign-
ments of error.

I. That the court erred in refusing to allow the defendant,
upon cross-examination, to ask the plaintiff's witness, J. J.
Wilkinson, whether he did not hear plaintiff say, after he was
discharged from prison, that he, the plaintiff, had made a great
reputation by what had taken place—to which question the
plaintiff objected, and the court refused to allow the question
to be asked.

The damages claimed in the plaintiff's declaration is for the
alleged injury inflicted upon his reputation, and the humilia-
tion upon him by reason of the arrest. These being at issue,
and the facts certified showing that there was nothing whereon
to base such claim unless it might be in these respects, and the
witness having stated upon his examination in chief that the
plaintiff had introduced Mr. Massey to the audience on the
night of the arrest in question, and the witness having given in
his examination in chief a detailed account of the plaintiff's
conduct and action on that night, both prior and subsequent to
the arrest, it was clearly within the scope of cross-examination

to show that, so far from being humiliated by the arrest, the plaintiff exulted in the reputation he had thereby acquired. And such being the evident object of the question rejected, we are of opinion that this assignment of error is well taken.

II. That the court erred in refusing the first instruction asked for by the defendant. That instruction is as follows: "That every judicial officer is exempt from liability in damages for his actions in matters within his jurisdiction, even though his judgment and actions based thereon should prove to be erroneous."

It cannot be doubted that this instruction correctly propounds the law.

In his admirable work on Torts, pages 408, 409, 410, Judge Cooley says: "Whenever, therefore, the State confers judicial powers upon an individual, it confers them with full immunity from private suits. In effect, the State says to the officer that these duties are confided to his judgment; that he is to exercise his *judgment* fully, freely, and without favor, and he may exercise it without fear; that the duties concern individuals, but they concern more especially the welfare of the State, and the peace and happiness of society; that if he shall fail in a faithful discharge of them he shall be called to account as a criminal; but in order that he may not be annoyed, disturbed, and impeded in the performance of these high functions, a dissatisfied individual shall not be suffered to call in question his official action in a suit for damages. This is what the State, speaking by the mouth of the common law, says to the judicial officer.

"The rule thus laid down applies to large classes of officers, embracing some the powers attached to which are very extensive, and others whose authority is very limited. It applies to the highest judge in the State or nation, but it applies also to the lowest officer who sits as a court and tries petty causes."

That there are cases seeming to hold, as contended by counsel for the defendant in error, that a justice is civilly responsible

when he acts maliciously or corruptly, is true. But Judge Cooley, after a careful analysis of a long line of authorities, reaching from Coke down to the present, says: "There are *dicta* in some cases that a justice is civilly responsible when he acts maliciously and corruptly, but they are not well founded, and the express decisions are against them." Cooley on Torts, 409, note 2.

In *Scott* v. *Stansfield* (3 Law Reports, Exchequer, 220) a judge of a county court was sued for slander. He pleaded that the words were spoken by him in his capacity as judge, while trying a case wherein the plaintiff was defendant. The plea was held to be a valid defence, the Chief Baron saying: "This doctrine has been applied not only to the superior courts, but to the court of a coroner, and to a court-martial, which is not a court of record. It is essential in all courts that the judges who are appointed to administer the law should be permitted to administer it under the protection of the law, independently and freely, without favor and without fear. This provision is not for the protection or benefit of a malicious or corrupt judge, but for the benefit of the public, whose interest it is that the judges should be at liberty to exercise their functions with independence and without fear of consequences."

In *Randall* v. *Brigham*, 7 Wall. 523, Mr. Justice Field said: "It is a general principle, applicable to all judicial officers, that they are not liable to a civil action for any judicial act done within their jurisdiction. In reference to judges of limited and inferior authority, it has been held that they are protected only when they act within their jurisdiction. If this be the case with respect to them, no such limitation exists with respect to judges of superior or general authority. They are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, *unless, perhaps, when the acts, in excess of jurisdiction, are done maliciously or corruptly.*" I italicise the very important qualification to the rule as stated by the learned judge, the importance of which will presently be seen.

In the subsequent case of *Bradley* v. *Fisher*, 13 Wall. 335, Mr. Justice Field also delivered the opinion of the supreme court, in the course of which, after a careful review of all the authorities, he explains the sense in which he uses the above-noted qualifying words in *Randall* v. *Brigham*, and says: "They were inserted upon the suggestion that the previous language laid down the doctrine of judicial exemption from liability to civil actions in terms broader than was necessary for the case under consideration, and that if the language remained unqualified it would require an explanation of some apparently conflicting adjudications found in the reports. They were not intended as an expression of opinion that in the cases supposed such liability would exist, but to avoid the expression of a contrary doctrine." And he proceeds: "In the present case we have looked into the authorities and are clear, from them, as well as from the principle on which any exemption is maintained, that the qualifying words used were not necessary to a correct statement of the law, and that judges of courts of superior or general jurisdiction are not liable in civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." But the learned judge proceeds: "A distinction must be here observed between excess of jurisdiction and the clear absence of all jurisdiction over the subject-matter. Where there is clearly no jurisdiction over the subject-matter, any authority exercised is a usurped authority, and for the exercise of such authority, where the want of jurisdiction is known to the judge, no excuse is permissible."

With this lucid explanation of the qualifying words used in stating the doctrine in *Randall* v. *Brigham*, *supra*, and made by the judge who delivered both opinions, no possible doubt remains, and the doctrine remains unshaken that all judicial officers, whether inferior or superior in grade, are, when acting within their jurisdiction, exempt from liability in civil actions for their judicial acts, though alleged to have been done ma-

liciously or corruptly; that judges of courts of superior, general jurisdiction, though acting in excess of their jurisdiction, and although such acts be alleged to have been malicious or corrupt, are not so liable, except where there is a clear absence of all authority as contradistinguished from mere excess of authority, acts in the clear absence of all jurisdiction—being usurpations and inexcusable. But with regard to judicial officers of inferior limited jurisdiction, the doctrine is that they must keep within their jurisdiction, and are liable to civil action for acts done in excess thereof, especially if such acts be prompted by malicious or corrupt motives.

"It is universally conceded," says Judge Cooley, "that when inferior courts or judicial officers act without jurisdiction, the law can give them no protection whatever." And referring to *Bradley* v. *Fisher, supra*, he says: "Recently, however, the rule has been held to be otherwise in the case of judges of the superior courts when the error consisted in exceeding their authority." And the learned author says: "Had it been a justice of the peace who had committed a like error, an action would have been supported, however honest might have been his motives, and however plain it might have appeared that he was intending to keep within his powers." Cooley on Torts, 419–20. On the same page the learned writer proceeds to show why the law would protect the one judge and not the other, and why, if it protects in such case only one, it should be the very one who, from his high position and presumed superior learning and ability, ought to be most free from error.

In *Burch* v. *Hardwicke*, 30 Gratt. 41, it was held that the mayor of Lynchburg had no jurisdiction to remove Hardwicke, who was not a municipal, but a State officer, and that he was prompted by malice in making the removal, and that, therefore, the mayor was liable in damages to Hardwicke. It is evident that that case was intended by the able judge who delivered the opinion to rest on the distinction taken in *Bradley* v. *Fisher, supra*, between a case where the judge or other officer

had *no* jurisdiction of the subject matter, and a case where the judge or other officer acted *in excess* of his jurisdiction—and not on the difference between the judges or other officers as respects whether their courts were of superior or of inferior jurisdiction.

In *Stone* v. *Graves*, 40 Am. Dec. 131, it was held that a justice of the peace was not liable in a civil action, when acting judicially, and within the sphere of his jurisdiction, however erroneous his decision or malicious his motive. See also *Yates* v. *Lansing*, 6 Am. Dec. 303; *Ramis* v. *Simpson*, 50 Texas 495; 32 Am. Rep. 609, where is adopted the language of Beardsly J., in *Weaver* v. *Drumdoff*, 3 Denio 117, that the rule exempting judges and other officers from liability in a civil suit for a judicial determination, however erroneous or corrupt, extends to all public officers from the highest to the lowest. See also 1 Minor's Ins. 108.

Discussing the question whether persons required to perform ministerial acts, and who are at the same time invested with the judicial character, are responsible in damages, Lord Brougham, in *Ferguson* v. *Kimoul*, 9 Cl. & Fin. 251 (referred to in Brown's Legal Maxims, page 94–5), says: "Even inferior courts, provided the law has clothed them with judicial functions, are not answerable for errors in judgment; and where they may not act as judges, but only have a discretion confided to them, an erroneous exercise of that discretion, however plain the miscarriage may be, and however injurious its consequences, they shall not answer for."

In view of all the authorities there can be no doubt that the first instruction asked for by the defendant rightly stated the law. But for the appellee, it is contended that it is an abstract proposition. An instruction is not considered as abstract where the pleadings show that it might apply to the case. *Shelton* v. *Cocke*, 3 Munf. 191. To the case at bar certainly the principle of law propounded by that instruction is expressly applicable. Hence it is not open to the alleged objection. But

it is also contended that the instruction is wrong, inasmuch as it proceeds on the assumption that Johnston was a judicial officer. That he was such there can be no question. He was mayor and *ex officio* a justice of the peace. In Virginia, with very few exceptions, the functions of a justice of the peace are judicial in character. 1 Minor's Ins. 108. When a justice considers a case upon the evidence and the law, and decides it, however the case is presented to him, whether formally or informally, whether it be civil or criminal, whether he decides upon the testimony of sworn witnesses or upon the evidence of his own senses, he acts judicially, and he that executes his decision acts ministerially. The fact that a judge or justice sometimes acts ministerially makes him none the less a judicial officer. At all events, the case here exhibited in the pleadings and facts certified would fully warrant any tribunal in arriving at the conclusion that Johnston, on the occasion of the arrest of Moorman, acted in his judicial capacity. Nor is there any evidence that he acted through personal spite or maliciously towards Moorman.

The grave importance of the case has induced us to set out in full the facts as certified. It must be apparent to every one that the really material facts are very few, and are confined to what occurred in the " Border Saloon " and just outside thereof, leading to and including Moorman's arrest by Johnston.

It is appropriate here to recur very briefly to those facts.

At a late hour at night Moorman and his party went to the " Border Saloon," in the bar-room of which they found the mayor (Johnston) and others. All hands took a drink, and then followed a quiet discussion of politics, with the singing of a song by one of the party, and a gleeful dance, in which Johnston participated, to the extent of skipping around a little, conduct not comporting gracefully with the dignified position of mayor, yet immaterial to the issue here. Soon Wilkinson entered the front door, and pushing the lattice door open discovered Boney with the party in the bar-room; asked who he

was, and being informed, immediately pushed the door open, rushed violently in, and angrily cried out to Boney: "You are the G——d damned rascal who urged Clark to hit me!" and immediately advanced on Boney, cursing and menacing him. Johnston at once intercepted Wilkinson in his violently aggressive career—took hold of him—saying: "I am the mayor, and I command the peace;" and after a scuffle, with aid, put Wilkinson out at the side door, and diagonally across the cross street, to the corner of that with Main street, and there succeeded in quieting Wilkinson. Two policemen had heard the disturbance, and came up, and were near by. Thus situated, there was necessarily between the corner where Johnston detained Wilkinson, and where they were, and the front door of the "Border Saloon," something more than the width of the cross street; so that had he really desired to do so, Boney could have passed out at the front door, and gone quietly away. But evidently such was not Boney's real purpose. That this is so, let us look to what occured in the saloon and outside, near by, immediately after Wilkinson was ejected by Johnston.

S. H. Yates, one of the bar-room party, led Boney through a door in the rear end of the bar-room and into a passage; but as Boney retired he called Moorman to him, saying he preferred the advice of two rather than one; and desired Moorman and Yates to effect a peaceable or *honorable settlement*. Moorman, claiming to be friendly to both, undertook to effect a peaceable settlement. It is important to see just here how Moorman proceeded on his mission of peace, especially as Johnston's theory is that he thought Moorman was bearing a challenge from Boney to Wilkinson, and therefore the arrest. Moorman accordingly went out on the street where Johnston was with Wilkinson, the latter having become quiet, and, addressing him (Wilkinson) as "Captain John," said; "Boney is in the bar there, afraid to come out and go home; he is unarmed, and does not wish to be attacked unprepared." This was certainly but little in the direction of a peaceable settlement.

VOL. LXXX—19

However, Wilkinson replied: "Tell him to come out and go home, that I am no d——d assassin." But Moorman, instead of taking the message to Boney, promptly replied: "He (Boney) will meet you to-morrow, and settle the matter." This surely and directly imported a hostile meeting; and Wilkinson so took it, for he instantly replied to Moorman: "I will meet him any time and any where." Then it was that Moorman moderated what he had last said by saying to Wilkinson: "You are both drunk to-night, and to-morrow there will be nothing of it; I don't know whether he wants to fight you at all."

It was the threatening language of Moorman which doubtless impressed Johnston, as it did Wilkinson, that a hostile meeting was contemplated, and caused Johnston to order Moorman away. This was clearly his duty, under the circumstances, and it was as clearly Moorman's duty to obey, Johnston asserting: "I am mayor, and I intend to settle this matter; and if you don't go away, I will send you to jail." But Moorman remained and remonstrated with Johnston, an officer of the law, plainly in the discharge of his duty, the preservation of the peace and order of the town of which he was the mayor. In remaining and refusing to depart, Moorman was certainly obstructing the officer of the law in the discharge of a duty to the public imposed by law, and Moorman's actions, to say the least, tended to reöpen the dangerous strife which Johnston for the time being had quelled.

Under these circumstances the arrest was ordered by Johnston. Looking impartially at the facts, it is impossible to conclude that he in any particular even strained his authority.

We repeat there can be no question that the act of Johnston complained of was done in the discharge of a judicial function. Indeed, the instruction given by the court, in lieu of the seventh instruction asked for by the defendant, concedes the judicial character of Johnston on the occasion in question. For these reasons we are of opinion that the hustings court erred in

refusing to give the said first instruction asked for by the defendant.

III. The court erred in refusing the said seventh instruction, and in giving in lieu thereof another, to-wit: "That if the defendant, being a conservator of the peace, with the power to apprehend offenders, had reasonable grounds for believing, from the action of the plaintiff, that the plaintiff was engaged, or about to engage, in a breach of the peace, or commit a felony, or was engaged in carrying or delivering a challenge to fight from one Boney to one Wilkinson, in the presence of the defendant, or that the plaintiff was, with others, riotously, tumultously, or unlawfully acting at a public place in Danville, or that the plaintiff was engaged or about to engage in an affray, the defendant had the authority under the law to arrest and imprison the plaintiff, although the plaintiff was in fact not engaged or about to engage in either of the above-named acts; and if they so believe, it will be their duty to find for the defendant."

Very little need be said as to this assignment. Whether the seventh instruction, asked for by the defendant, was proper or not, it is not necessary to decide, as there is no room to doubt that the substitute was erroneous and should not have been given. The instruction given makes the jury the judge of the reasonableness of the grounds of the defendant's action as to a matter within his judicial jurisdiction and discretion. It takes away from the defendant the right to judge whether ground for arrest existed, and refers it as a question of fact to the jury to be by it decided, not from what happened in the sight and hearing of the defendant, but from evidence adduced before the jury. This was not a proper question to be left to the jury. 2 Addison on Torts, 877.

In the view of the case already expressed it is unnecessary to notice the remaining assignments, as, for the errors already noticed, the judgment of the hustings court must be reversed, and the verdict of the jury set aside, with costs to the plaintiff

in error, and the case remanded to the hustings court of Danville for a new trial, at which, if instructions should be asked for, such instructions shall be given in accordance with the views set forth in this opinion.

HINTON, J., dissented.

JUDGMENT REVERSED.